(No. 57216.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WILLIAM T. JONES, Appellant.

*Opinion filed February 6, 1985.*

346

Charles M. Schiedel, Deputy Defender, and Carroll J. King, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Mark L. Rotert and Marcia L. Friedl, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

In an indictment returned in the circuit court of Jefferson County, defendant, William T. Jones, was charged with the murder and felony murder (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(2), (3)) of Margaret Dare, attempted murder (Ill. Rev. Stat. 1981, ch. 38, pars. 8—4(a), 9—1(a)(1)) of James Dare, armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 18—2), home invasion (Ill. Rev. Stat.

1981, ch. 38, par. 12—11), residential burglary (Ill. Rev. Stat. 1981, ch. 38, par. 19—3(a)), and aggravated battery (Ill. Rev. Stat. 1981, ch. 38, par. 12—4(b)(1)). Following a jury trial, defendant was convicted of felony murder, murder, attempted murder, armed robbery, residential burglary, and aggravated battery. In a death penalty hearing requested by the People, the jury found that one or more of the factors set forth in section 9—1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(d)) existed and found that there were no mitigating factors sufficient to preclude a sentence of death. Defendant was sentenced to death, and the sentence was stayed (87 Ill. 2d R. 609(a)) pending appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d R. 603). Defendant was also sentenced to natural life for murder, 60 years for attempted murder, 60 years for armed robbery, 30 years for residential burglary, and 10 years for aggravated battery.

James Dare, 62 years of age, testified that on January 25, 1982, he and his wife, Margaret, resided in a rural area in Jefferson County. That night, the couple went to bed at about 10 p.m. Some time after falling asleep he heard Margaret shouting, "Come quick." He went to the living room where he saw a man with his arms around Margaret. The intruder threatened, "If you interfere, I'll kill her." Mr. Dare could recall nothing further.

Louise Breeze, Margaret Dare's aunt, lived in a trailer next to the Dare residence. She testified that Margaret visited her almost every morning, and that, when Margaret failed to answer her telephone calls on the morning of January 26, Mrs. Breeze called Margaret's sister, Lucy Baker. At approximately 9 a.m. Mrs. Breeze went to the Dare residence. She saw Margaret on the living room sofa, and James struggling toward the front door. There was blood "all over the room and

her [Mrs. Dare]." Mrs. Breeze ran to her trailer to telephone for an ambulance and the sheriff.

When the ambulance attendants arrived, they examined Margaret Dare and determined that she was dead. Deputy Sheriff Jerry Almaroad and Chief Deputy Roy Bradford arrived at the scene at 9:13 and 9:15 a.m., respectively. Bradford testified that Dare stated that a black man had broken into his house in the middle of the night. When a paramedic arrived at approximately 9:20 a.m., Dare was in a deep state of shock and could not further respond to either verbal or physical stimuli.

Deputy Almaroad testified that the living room showed signs of a struggle. He determined that a stereo had been removed because a turntable dust cover was upside down on the floor and speaker wires had been disconnected. He also concluded that a portable television had been taken because its silhouette had been traced in the dust on a stand, and the wires had been cut. A large, wooden-handled knife, later identified by Dorothy Lacey as being hers, was found in a wash pan in the kitchen. The knife, together with a television set, jewelry, a clock, and a quilt, had been stolen from Mrs. Lacey's home in Mt. Vernon during a burglary on January 23.

James Jennings, defendant's brother-in-law, testified that between 10 and 10:30 p.m., January 23, defendant came to the residence where Jennings and Larry Faint lived. Defendant brought a television, a television stand, a white quilt, a clock, and some jewelry into the house. These items remained there until defendant picked them up the next day. Defendant left Jennings' home but returned sometime in the early morning hours of January 26. Defendant, Jennings and Faint decided to go to Decatur. Both Faint and Jennings testified that, on the way to Decatur, all three sat in the front seat because a television and stereo covered with a white quilt were in

the back seat of the car. Upon arriving in Decatur, they went to defendant's sister's apartment.

Faint testified that the stereo and television were taken into defendant's sister's apartment and that it was necessary to wipe off the stereo because it appeared that there was blood on it. After unsuccessful attempts to sell the stereo and television, defendant found an auction where he sold the television for $50. Defendant and his companions then left Decatur for Mt. Vernon. On their way, they stopped in Centralia to attempt to sell the stereo. The stereo was not sold, and they returned to Mt. Vernon. Defendant testified that he then took Faint to his apartment and took Jennings to a restaurant where they saw Jennings' sister. She informed them that the police were looking for Jennings and defendant. Defendant returned home, spoke with his wife, and went to the police department. He drove to police headquarters in his 1971 Ford Torino. A confidential source had informed Deputy Sheriff Lamar that a friend of defendant had told him that stolen property could be found in defendant's car. A search warrant was issued, and defendant's car was searched. The officers discovered a white quilt and jewelry, all later identified by Mrs. Lacey as items taken during the burglary of her home in Mt. Vernon two nights before the crimes at the Dare residence. Her identification of these items was the basis for connecting defendant to the crimes committed at the Dare residence because, as noted earlier, the wooden-handled knife found at the Dare residence had been identified by Mrs. Lacey as being hers.

Defendant contends first that the conviction must be reversed for the reason that the People failed to prove his guilt beyond a reasonable doubt. We do not agree. The testimony shows that an individual with the same type of blood as defendant had been in the Dare home on the night of the murder. The evidence also shows that

a knife taken in the burglary at the Lacey home was found in the Dare home and that other items taken in the Lacey burglary were found in defendant's automobile. Defendant's testimony, and the testimony of the other individuals whom he saw that night and with whom he went to Decatur and Centralia, do not exclude the possibility that sometime during that night defendant could have perpetrated the crimes.

Defendant contends correctly that when a conviction for murder rests upon circumstantial evidence the guilt of the defendant must be so thoroughly established as to exclude every other reasonable hypothesis. (*People v. Garrett* (1975), 62 Ill. 2d 151, 163.) It is not necessary, however, that the jury be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all the evidence taken together satisfies the jury beyond a reasonable doubt of the accused's guilt. (*People v. Foster* (1979), 76 Ill. 2d 365, 374.) We have considered defendant's argument that he presented credible, corroborated testimony which accounted for his whereabouts at the time the murder was committed. The credibility of defendant and the witnesses who testified in his defense was for the jury to determine. Defendant, in electing to testify in his own behalf, submitted his credibility to the usual tests applicable to the testimony of other witnesses, and the jury could take into consideration the probability or improbability of the truth of his statements. From our examination of the record we conclude that the evidence was sufficient to support a finding of guilty beyond a reasonable doubt.

We consider next defendant's contention that the circuit court erred in failing to declare a mistrial when a mimeographed copy of a racist "joke" was found in the jury room. We refuse to disseminate this scurrilous material, and it suffices to note that it contains denigrating, racist comments which are insulting to black people. At

the conclusion of defendant's case and before rebuttal, after the court had adjourned for the day, a courthouse janitor discovered a mimeographed copy of the "joke" in the jury room. He notified the bailiff, who, in turn, notified the trial judge. The following day the parties met in chambers to discuss the matter. It was agreed that the jurors should be examined individually to determine who, if anyone, had seen it, and whether it would affect his deliberations. Of the 12 jurors, 8 had not seen the material. The juror who had brought the material into the jury room was questioned, dismissed, and replaced by an alternate juror who had not seen it. Three jurors on the panel as finally composed stated that they had seen the material. Two of those jurors had read at least part of the material. All three testified that it would have no prejudicial effect on their deliberations.

The juror who brought the material into the jury room testified that he had brought two copies, one of which was taken by "a lady," but that she was not one of the jurors. He testified that he made no remarks concerning the material to the other jurors but simply set it on the table in the jury room. Arguing that the entire panel had been tainted by exposure to the material, defendant moved for a mistrial. The circuit court denied the motion, concluding that no evidence of prejudice had been presented.

Defendant argues that the entire panel had been tainted by exposure to the material because its content "evinces an attitude which precludes the fair and impartial consideration of evidence which is constitutionally guaranteed to every person charged with a crime." He also argues that the circuit court could not have made an informed decision whether the jury was influenced by the material because the court failed to ascertain whether the second copy of the material had been taken out of the jury room by another juror. Citing *People v.*

*Cole* (1973), 54 Ill. 2d 401, the People argue that defendant must be able to point to specific evidence in the record establishing prejudice and that mere suspicion of prejudice is not evidence. They argue that the trial judge is in a superior position to observe the jurors' demeanor and that the determination is within the sound discretion of the circuit court. They contend that defendant is unable to point to any evidence which would support a finding that any juror, other than the juror who brought the material into the jurors' room, was prejudiced against defendant by reason of his race or as the result of having seen the objectionable material.

Although the People are correct in their contention that in most cases involving claims of deprivation of due process evidence of prejudice to the accused is required, there are circumstances which create "such a probability that prejudice will result that [the trial] is deemed inherently lacking in due process." (*Estes v. Texas* (1965), 381 U.S. 532, 542-43, 14 L. Ed. 2d 543, 550, 85 S. Ct. 1628, 1633.) Such circumstances are present here. Where black racist material is found in the jury room during the trial of an accused black man, and the material has admittedly been read by three members of an all-white jury, such circumstances are intolerable, and prejudice to defendant will be presumed. We are concerned, too, that the jurors did not bring the material to the attention of the court. This may be indicative of either lack of appreciation for their responsibility as jurors, or that they did not consider it offensive.

A situation which was already inherently prejudicial was further exacerbated by the fact that the juror who brought the material into the jury room testified that "a lady" took one of the copies of the material from the jury room. Although he testified that she was not one of the jurors, a nonjuror lady's presence in the jury room at that time is inexplicable. The presence in the jury

room of a nonjuror, or of a juror who kept the offensive material, presented a danger of prejudice which the circuit court should have further pursued. A fair trial requires the participation of impartial jurors (*Irvin v. Dowd* (1961), 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639), and in the circumstances shown here, we cannot conclude that defendant received a fair trial. We hold, therefore, that the circuit court erred in failing to declare a mistrial.

The parties have briefed and argued a number of questions, but in view of our conclusion that the judgment must be reversed and the cause remanded for a new trial, we need not consider those which are unlikely to arise on retrial. Other questions have been decided in other opinions adversely to defendant's contentions and need not be reconsidered. We shall, therefore, consider only those contentions relevant to alleged errors likely to recur on retrial.

Defendant contends that the circuit court erred in permitting Deputies Bradford and Almaroad to testify to James Dare's out-of-court statements. Mr. Dare testified that he was unable to recall any details of the attack on him and his wife. D. W. Meyers, an ambulance attendant, was the first person to whom Dare spoke, approximately eight hours after the crimes were committed. Meyers testified that "I asked him did somebody do this to you and he said, 'Yes, a man in the middle of the night.' And that is all he said to me." Defendant makes no issue concerning the admission of this statement. Deputy Almaroad testified over objection that when he arrived on the scene he questioned Dare. He testified that "his response was that someone had broke into his house. He stated that he thought they were black, and just one of them." Deputy Bradford also testified that Dare stated that he had been attacked by a black man in the middle of the night. The addition of the statement

that the intruder was black is significant because the evidence showed that the blood type of the presumed offender was twice as likely to occur in the black as in the white populations.

Defendant argues that Dare's statements to the deputies revealed this information because it was elicited by the deputies' leading questions. He argues, too, that the circuit court ignored a substantial time lapse between the crimes and the statements, and disregarded the fact that Dare's statements to the deputies were not the first statements he had made.

In *People v. Robinson* (1978), 73 Ill. 2d 192, this court restated the test to be applied to such hearsay testimony:

> "This court has repeatedly held that, for testimony to qualify as a spontaneous declaration and be admissible regardless of declarant's presence at trial, three elements must be present: '(1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence.' (*People v. Poland* (1961), 22 Ill. 2d 175, 181.) As this court noted in *Poland*, 'The pertinent point is whether there was a lack of sufficient time to allow an opportunity for reflection and invention.' (22 Ill. 2d 175, 181.)" (73 Ill. 2d 192, 199.)

In *Robinson*, a statement made by the victim more than 3½ hours after the crime had been committed was held to be inadmissible as a spontaneous declaration. Here approximately eight hours had elapsed since the crime had been committed before Dare had the opportunity to make any statement concerning the occurrence. Furthermore, his statements to Deputies Almaroad and Bradford came after he had spoken to Meyers, and these later statements included more detail than the first statement given to Meyers. Here, as in *Robinson*, "[t]o conclude that [Dare's] statements were spontaneous in

this case would do utter violence to the rule." 73 Ill. 2d 192, 199.

Defendant contends next that the circuit court erred in refusing his request that the jury be instructed with the second paragraph of Illinois Pattern Jury Instruction (IPI), Criminal, No. 3.02 (2d ed. 1981) (definition of circumstantial evidence), because there was no direct evidence of defendant's guilt. IPI, Criminal, No. 3.02, provides:

> "Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of [(the) (a)] defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict.
>
> You should not find the defendant guilty unless the facts or circumstances proved exclude every reasonable theory of innocence."

The People argue that the *corpus delicti* of each of the crimes charged was proved directly by Dare's eyewitness testimony and by medical evidence. Citing *People v. Evans* (1981), 87 Ill. 2d 77, defendant argues that the second paragraph of this instruction must be given where proof of guilt as to each element of the offense is circumstantial.

"Circumstantial evidence is the proof of facts or circumstances which gives rise to a reasonable inference of other facts which tend to establish the guilt or innocence of a defendant." (*People v. Evans* (1981), 87 Ill. 2d 77, 83.) This court has held that the second paragraph of the instruction "should be given when the proof of guilt, as to each element of the offense, is circumstantial." (87 Ill. 2d 77, 83.) In view of our holding that Dare's statements to the deputies were erroneously admitted, defendant's conviction was based solely on circumstantial evidence and the circuit court's failure to include the second para-

graph of the instruction was error.

We next consider defendant's contention that the circuit court erred in failing to suppress items seized from defendant's automobile pursuant to a search warrant supported only by the hearsay statements of an unknown informant whose reliability had not been established. The record shows that at approximately 11 or 11:30 p.m. on January 26, Deputy Lamar received a phone call from a confidential source in Mt. Vernon. The confidential source related to Lamar a conversation he had had with a third person. This third person told the confidential informant that defendant had come to the third person's house in the early morning hours that day with a stereo, speakers, and a television, all of which were covered with blood. Lamar testified that, according to the informant, defendant and the third person had the following conversation: " 'I will bet you either killed someone or fucked someone up getting this.' And this other person that was with [defendant] said, 'You took the words right out of my mouth.' " The aforementioned items were then placed in defendant's trunk.

Defendant contends that this information presented to the judge who issued the warrant was neither detailed nor corroborated in any way which shows that the informant was reliable. He argues that the third person, who allegedly knew something first hand about stolen property in the trunk of defendant's automobile, was not shown to be reliable. The People contend that defendant's argument, that the failure of the complaint upon which the warrant was issued to establish the reliability of facts provided by the informant, improperly attempts to isolate the "veracity" prong of the *Aguilar-Spinelli* test. *Aguilar v. Texas* (1964), 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509; *Spinelli v. United States* (1969), 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584.

We agree with the People that the sufficiency of the

complaint does not rest on whether each segment of the two-prong *Aguilar-Spinelli* test is complete. (*Massachusetts v. Upton* (1984), 466 U.S. ___, 80 L. Ed. 2d 721, 104 S. Ct. 2085.) In *Upton* the Supreme Court clarified its position regarding probable-cause determinations based on an informant's tip:

> "We did not [in *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317,] merely refine or qualify the 'two-pronged test.' We rejected it as hypertechnical and divorced from 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' *Brinegar v. United States* [(1949), 338 U.S. 160, 93 L. Ed. 1879, 69 S. Ct. 1302]. Our statement on that score was explicit. '[W]e conclude that it is wiser to abandon the "two-pronged test" established by our decisions in *Aguilar* and *Spinelli*. In its place we reaffirm the totality of the circumstances analysis that traditionally has informed probable cause determinations.' " (466 U.S. ___, ___, 80 L. Ed. 2d 721, 726-27, 104 S. Ct. 2085, 2087-88.)

The sufficiency of the complaint rests on whether the complaint, "considered as a whole, adequately establishes that there was 'a fair probability that *** evidence of a crime [would] be found in a particular place.' (*Illinois v. Gates* (1983), 462 U.S. 213, 238, 76 L. Ed. 2d 527, 548, 103 S. Ct. 2317, 2332; ***.)" (*People v. Gacy* (1984), 103 Ill. 2d 1, 22.) The complaint alleged that the third person told the informant that he saw defendant in possession of items which were covered with blood. This was consistent with the fact that a great deal of blood was present at the crime scene. The informant also stated that the third person saw defendant in possession of a stereo, speakers, and a television. This was consistent with the fact that a stereo, speakers, and television were missing from the Dare residence. We conclude that there were sufficient facts to establish probable cause to support issuance of the warrant.

Defendant contends next that the court erred in permitting the People to introduce evidence of a prior crime, the Lacey burglary, which occurred in Mt. Vernon two nights before the crimes committed at the Dare residence. He argues that the probative value of this evidence is outweighed by its prejudicial effect. The People argue that the knife found at the Dare residence and later identified by Mrs. Lacey as belonging to her was highly relevant in linking defendant to the crimes committed at the Dare residence, because other items stolen from Mrs. Lacey were later found in defendant's possession.

Evidence of the commission of other crimes is admissible when such evidence is relevant for any purpose other than to show the propensity to commit crime. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182.) The People argue that the purpose of the introduction of this evidence was to show defendant's identity and his presence at the scene. Although exclusive and unexplained possession of recently stolen property is insufficient, standing alone, to prove burglary beyond a reasonable doubt, it may be used with other corroborating evidence of guilt to support a conviction. (*People v. Housby* (1981), 84 Ill. 2d 415.) Defendant testified that he purchased the jewelry from Brady Brown and that Faint placed the blanket in defendant's car before they left for Decatur. However, Brown testified that he had never possessed the jewelry, nor did he sell it to defendant; Jennings corroborated Faint's testimony that he did not place any items in defendant's car before going to Decatur. Thus, corroboration which supported the inference that defendant participated in the Lacey burglary is presented where defendant himself offers an explanation of possession of the property that the jury reasonably finds to be false. (*People v. Housby* (1981), 84 Ill. 2d 415, 430-31.) Therefore, there was "rational connection" between the

fact of possession of property recently taken in the Lacey burglary and the inferred fact of participation in that burglary. (*County Court v. Allen* (1979), 442 U.S. 140, 165, 60 L. Ed. 2d 777, 797, 99 S. Ct. 2213, 2228.) The presence at the Dare home of the knife taken in the Lacey burglary and the presence of Lacey's quilt and jewelry in defendant's automobile do indeed serve to show defendant's identity and his presence at the scene. The circuit court did not err in admitting evidence of the commission of the Lacey burglary.

Although only one person was killed, defendant was convicted of two counts of murder. Defendant was charged with (1) stabbing Dare with a knife, knowing such an act created a strong probability of death or great bodily harm, thereby causing her death; and (2) murder, while committing a forcible felony, armed robbery. When multiple convictions are had for offenses arising out of a single act, the rule is that the sentence is imposed on the most serious offense. (*People v. Donaldson* (1982), 91 Ill. 2d 164, 170.) Although the evidence supports a conviction on both charges, there was only one person murdered; and there can be but one conviction. (*People v. Szabo* (1983), 94 Ill. 2d 327, 350.) In *People v. Mack* (1984), 105 Ill. 2d 103, involving one homicide, the defendant was convicted of three counts of murder. This court vacated two convictions and affirmed the conviction based on the most serious of the three charges. On remand, if defendant is found guilty of the crimes charged, the sentencing should comport with the principles enunciated in *Mack*.

For the reasons stated, the judgment is reversed and the cause remanded to the circuit court of Jefferson County for further proceedings consistent with this opinion.

*Reversed and remanded.*