THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
AUREL PETRUSEL, Defendant-Appellant.

First District (1st Division)   No. 1—90—0840

Opinion filed November 23, 1992.

Rita A. Fry, Public Defender, of Chicago (James S. Jacobs, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Linda Woloshin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Following a jury trial, defendant Aurel Petrusel was convicted of the shooting murder of Ionel Busta and sentenced to 20 years' imprisonment. (See Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a).) Defendant appeals his conviction and sentence, alleging: (1) the State failed to prove beyond a reasonable doubt that he committed first degree murder; rather, the evidence only proved voluntary manslaughter; and (2) prosecutorial misstatements of law and fact during closing argument denied him a fair trial. We affirm.

Caliopa Mundean testified for the State that she was a 28-year-old Rumanian-born United States resident. On February 21, 1987, at about 8 p.m., she and her husband arrived at the community center of St. Mary's Rumanian Orthodox Church at 4225 North Central in Chicago to watch Rumanian dancers.

At 9:30 p.m. that evening, she met with defendant and his wife, whom Mundean knew from prior functions. Mundean went to the Petrusels' table, where she conversed with Mrs. Petrusel about their children. Defendant and Mundean danced, returning to the Petrusels' table when they finished.

After being seated, now about 10:10 p.m., defendant told Mundean to look under the table. Mundean thought defendant was joking around. Defendant then put a gun on the table. Defendant told Mundean that the gun was real, and defendant's wife confirmed this fact when Mundean inquired about the matter. Defendant then mentioned that "some brains will fly tonight." Defendant did not make reference to any particular person. Mundean thought defendant was joking, and she mentioned to defendant that he should go shoot her brother-in-law, who was causing problems in Mundean's marriage. Although Mundean really believed that her brother-in-law deserved to be killed, Mundean was just joking about killing him. She could never do that.

When the police arrived later that night, Mundean told them nothing about her conversations with defendant. She did not witness the shooting. On March 11, 1987, Mundean went and told the police about her conversation with defendant.

Aurel Dragoi testified that he was a 38-year-old United States resident of Rumanian nationality. On February 21, 1987, he was president of the St. Mary's Rumanian Orthodox Church Council. That evening, a group of Rumanian singers came to Chicago to perform for Chicago's Rumanian community. The event was held at the church's cultural center at 4225 North Central in Chicago. The event began around 7:30 p.m.; approximately 250 to 300 people attended.

At about 11 p.m. that evening, Dragoi saw defendant and Ionel Busta, the victim, arguing in the bar. Dragoi could not hear what they were arguing about because of the noise. Dragoi separated the two and told each to go to his table. The two complied. Dragoi observed neither individual strike the other or attempt such a strike.

Dragoi then accepted Busta's invitation to go have a drink at his table, where four to five others were sitting. Dragoi had known both defendant and Busta for three years prior to the incident. Busta and his brother were working for Dragoi.

After visiting for about 20 minutes, Dragoi observed defendant approaching the table, whereupon Busta stood up, and the two began arguing again. Dragoi could not hear the content of the argument. He then told defendant to leave and Busta to sit down. Dragoi observed neither man strike the other or attempt such a strike.

Dragoi next went to the parish office to get a monthly bulletin. The office was located within the same building. When Dragoi returned between 5 to 15 minutes later, now about 11:50 p.m., he saw defendant and Busta arguing again in the foyer of the church hall. Because of the noise and music, Dragoi again could not hear the subject of the argument.

Defendant's wife then approached the two men. The three were talking about something but Dragoi could not hear. About 30 seconds after defendant's wife arrived, Dragoi observed Busta slap Mrs. Petrusel with an open hand, snapping back her head. He did not see Busta kick Mrs. Petrusel. Dragoi approached the three to stop the argument. As he approached, he observed the Petrusels walking towards Busta while Busta was walking backwards. Busta was facing the Petrusels as he took five to six steps backwards, and his hands were moving. Dragoi heard swearing in Rumanian as he approached closer.

Dragoi arrived to where the three were arguing and attempted to break them apart. The three were only a few feet apart. Before he had the chance, defendant pulled out a gun from his right pants pocket, put it six to seven inches away from Busta's head and shot him. Approximately 20 seconds had elapsed between defendant's wife

being slapped and Busta being shot. Defendant turned the gun towards Dragoi, who ducked and heard a second shot. He then ran into the nearby bar room.

Another witness would later testify that someone then kicked defendant's hand. The gun dropped to the floor. Defendant then attempted to run out the entrance door but was restrained. The victim later died from the gunshot wound to the head.

Detective Poli of the Chicago police department testified that defendant failed to appear on September 26, 1988, for his trial. On May 6, 1989, Poli saw defendant in Vienna, Austria, where he was being jailed for attempting to cross the border into Rumania with a false passport. Detective Poli escorted defendant back to the United States from Vienna.

Marioara Petrusel testified for the defense that she and defendant, now divorced, went as husband and wife on February 21 to the church function. They arrived at about 7:30 to 8 p.m. At about 11 p.m., she was dancing and learned that her husband was having an argument with another man. She stopped dancing and walked to where her husband was located.

When she arrived, she saw him arguing with the victim. Another person was standing between them. She asked defendant what was happening, and defendant responded that the victim wanted to "beat him" and had been following him all night. She then asked the group of men in Rumanian what was going on there. The victim told Mrs. Petrusel to "suck my ____." She replied that he could "give it to your mother." The victim then slapped her in the face, and then kicked her in the knee. She fell to the ground on one knee. Defendant then said to the victim, "[W]hat did you say that to her; is she your bitch?" The victim then said to defendant in Rumanian, "I am going to kill you, mother_____." Defendant was about two feet away from the wall. The victim then went to grab defendant. Defendant backed up toward the wall. Mrs. Petrusel testified that she then closed her eyes and heard two shots. Mrs. Petrusel identified photographs depicting her face and knees showing marks which were not present prior to being struck. She denied seeing defendant's gun earlier in the evening, and never heard defendant say anything about brains flying.

Defendant testified on his own behalf that he went to the church social with his wife on February 21, 1987. Defendant was carrying a weapon that night. He carried one as a truck driver for safety. That evening, he had recently quit work and changed clothes at home. He took the gun with him to the church function. Defendant did not have a license for the gun.

Defendant was at the bar with another man getting a drink when he heard the victim and other Rumanian men arguing loudly. Defendant knew the victim. Defendant looked over at the group and smiled at the victim. Without explanation, the victim approached defendant, grabbed him by his tie and hit him under his chin on the lower jaw. Defendant froze because he was surprised. Two other men and Aurel Dragoi grabbed the victim. Defendant returned to his table.

About 25 to 30 minutes later, defendant had to visit the men's room. The victim's table was located on the way; no other way to the men's room existed. As defendant passed by, the victim stood up and asked defendant to step outside. Defendant told him to take his "dirty hands off my clean shirt, please." A man separated the two, and defendant continued to the bathroom.

Defendant exited the men's room and the victim was waiting for him. Defendant told the victim to leave him alone. Defendant's wife then approached. She asked defendant in Rumanian what was going on, and defendant responded that he did not know what the victim had against him. Defendant's wife then asked in Rumanian what was going on or what was the reason for fighting. The victim responded, "What's up with you, bitch[?]" She again asked what was going on, and the victim responded, "What if your bitch would suck my ____[?]" Defendant's wife responded, "Why don't you let your mother do that[?]" The victim then slapped defendant's wife with an open hand across her cheek. He then kicked her in the leg. Defendant was upset and asked the victim why did he treat her like that, "is she your bitch?"

Defendant testified that the victim then "jumped towards me moving his right hand toward his back by his body." Defendant took one step backward. The victim told defendant, "I'am going to kill you, son of a bitch." Defendant thought, "that was it, I'm done." He reached into his pocket for his gun and, without intending to kill but only to scare the victim, pulled the trigger. Defendant testified that because of what the victim had said and done to his wife, and his hand movement, he was in fear of his life and that of his wife. Defendant fired two shots, with the second occurring after he was kicked between the legs. Defendant also claimed the shooting was an accident.

Defendant left the country on September 6, 1988. He was to return for court on September 26, 1988. His return flight bore a September 26, 1988, date, but defendant claimed he could return sooner under the ticket.

Defendant testified that he did not tell the police everything the night of the shooting because he did not understand the laws of the United States and was afraid of the consequences the shooting would have on his wife and children. He had no fear of talking to the Rumanian police.

Defendant denied telling Caliopa Mundean that some brains would fly that night. Defendant claimed that she said that herself in reference to her brother-in-law. Defendant admitted, however, showing her the gun. Defendant's wife was not present at this time.

Following closing arguments, the jury deliberated and returned seven hours later, finding defendant guilty of murder. Defendant brings this appeal.

Defendant first claims on appeal that the State failed to prove beyond a reasonable doubt that he possessed the requisite mental state for the crime of murder. Defendant asserts that, at most, the evidence showed he killed the victim while acting under a sudden and intense passion resulting from serious provocation. We disagree.

In reviewing a sufficiency of the evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.) It is not our function on review to retry the defendant, and we will not reverse a conviction unless the evidence asserted to sustain it is so improbable or unsatisfactory that it creates a reasonable doubt of guilt. *Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277.

The standard of review articulated above applies whether the evidence is direct or circumstantial. (*People v. Pintos* (1989), 133 Ill. 2d 286, 549 N.E.2d 344.) Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to establish the guilt or innocence of a defendant. (*People v. Jones* (1985), 105 Ill. 2d 342, 355, 475 N.E.2d 832, 838.) Each link in the chain of circumstances need not satisfy the jury beyond a reasonable doubt; it is sufficient if all the evidence taken together satisfies the jury beyond a reasonable doubt of the accused's guilt. *Jones*, 105 Ill. 2d at 355, 475 N.E.2d at 838.

Defendant was found guilty of murder in violation of section 9—1(a) of the Illinois Criminal Code of 1961, which provides in part:

> "A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

\*\*\*
(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another." Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a).

On appeal, defendant asserts that the proper conviction should have been for voluntary manslaughter, not murder:

"(a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) The individual killed \*\*\*[.]
\*\*\*

Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." Ill. Rev. Stat. 1985, ch. 38, par. 9—2.

■ On appeal, defendant limits his sufficiency argument to voluntary manslaughter. Accordingly, with respect to this crime, the determinative question at trial was whether there existed such provocation as would have caused the state of mind claimed in a reasonable person under the same circumstances. The test is objective, not subjective. The jury apparently determined the victim's conduct towards defendant and his wife was not sufficiently provocative to justify defendant's shooting of the victim in the face at close range. This was the jury's call (*People v. Johnson* (1979), 70 Ill. App. 3d 149, 388 N.E.2d 225), who observed the witnesses, evaluated their credibilities and assessed whether sufficient provocation existed. After reviewing the evidence in this case with respect to the issue of provocation, specifically, the victim's conduct towards defendant and his wife immediately preceding the shooting, we cannot say that "the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277.

Defendant cites numerous cases to support his argument that the evidence supported only one verdict and that this court must reduce his conviction to voluntary manslaughter. (See *People v. Collins* (1991), 213 Ill. App. 3d 818, 572 N.E.2d 1005, *appeal denied* (1991), 141 Ill. 2d 548, 580 N.E.2d 122; *People v. Robles* (1975), 30 Ill. App. 3d 335, 332 N.E.2d 46; *People v. Stowers* (1971), 133 Ill. App. 2d 627, 273 N.E.2d 493; *People v. Newberry* (1970), 127 Ill. App. 2d 322, 262 N.E.2d 282.) Defendant's cases are not persuasive.

Except for *Collins*, the reviewing court found the evidence entitled the jury to reach the voluntary manslaughter verdict it did. The courts accordingly affirmed the jury's verdict. Contrary to defend-

ant's assertion, none of these cases stand for the proposition that, in this case, the evidence *required* a voluntary manslaughter verdict as a matter of law. Indeed, the cases stand for the proposition that intent issues are uniquely for the jury to decide, whose decision is accorded appropriate deference on review.

As for *Collins*, the reviewing court grudgingly reversed a jury's murder verdict to voluntary manslaughter. The facts of that case, however, revealed mutual combat between the defendant and the deceased. Such a situation is not present here. Each case must turn on its own facts.

Defendant next contends on appeal that prosecutorial comments during closing argument denied him a fair trial. Defendant alleges both misstatements of fact and law.

▮ Defendant first questions the prosecutor's allegation during rebuttal that the first words from Mrs. Petrusel's mouth were a lie. Defendant's objection to the statement was sustained, and the court instructed the jury that it heard the witness' testimony. In defendant's post-trial motion, defendant only asserted generally that the assistant State's Attorney "made prejudicial inflammatory and erroneous statements in closing argument." No specific comments were mentioned.

Following the court's response to the above comment, the State argued that Mrs. Petrusel's lies continued when she testified that she did not see her husband's gun until the shooting occurred and that she does not recall her husband stating that "some brains would fly" that night. The State was apparently asking the jurors to remember Caliopa Mundean's testimony that Mrs. Petrusel was present at the table when defendant exhibited his gun and made the statement in question. Defendant made no contemporaneous objection to these latter comments by the State.

Defendant has waived review of the State's comments. To preserve an issue for appellate review, "both a trial objection and a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) Defendant's general assertions in his post-trial motion do not preserve the issue for review. *People v. Thomas* (1984), 121 Ill. App. 3d 883, 460 N.E.2d 402.

Even if we were to reach the merits of the comments under the plain error doctrine, no error has occurred. A prosecutor is allowed wide latitude during closing argument, and absent an abuse of discretion, the trial court's determination as to the propriety of the argu-

ment will be followed. (*People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 379 N.E.2d 847.) A prosecutor may comment on the evidence, draw reasonable inferences therefrom and discuss the witnesses' credibility. *Weatherspoon*, 63 Ill. App. 3d 315, 379 N.E.2d 847.

In this case, the prosecutor could properly comment that Mrs. Petrusel was lying to protect her ex-husband. While we may question this tactic's persuasiveness with the jury, the State's comments were appropriate nevertheless. We accordingly find that no error has occurred.

■ Defendant's next allegation of factual miscomment was the prosecution's statement that defendant had to strain to release the safety on the gun before shooting. The State argued that this evinced defendant's intent to murder. Defendant posed no objection during trial to the comment.

We find that defendant has waived review of the comment. Defendant correctly asserts that no evidence existed that the gun's safety was on prior to defendant shooting the victim. Thus, it was improper for the State to argue that the safety was difficult to move and that defendant "slipped it over there before he blew the guy's brains out." Defendant's failure to raise a contemporaneous objection, however, denied the trial court the opportunity to correct the State's improper comment. It is fundamentally improper to allow defendant to gain a reversal without providing the trial court an opportunity to prevent or correct any alleged error by failing to make timely objection. (*People v. Center* (1990), 198 Ill. App. 3d 1025, 556 N.E.2d 724.) This policy is particularly appropriate relative to the comment in question. Had defendant contemporaneously objected, the court could have corrected the erroneous statement.

Although we have found the State's comment to be erroneous, no new trial is required. The jury was subsequently instructed that closing arguments are not evidence and that the jury is to disregard argument not based on the evidence. Moreover, the question of defendant's intent at trial turned on the sufficiency of the provocation to justify defendant's actions. As discussed earlier, the jury was entitled to reject defendant's heat of passion argument. We find, therefore, that the prosecutor's gun safety comment was not a material factor in defendant's conviction.

■ Defendant next directs this court to two misstatements of law which he claims denied him a fair trial. Defendant recites the comment that, "Ladies and gentlemen, you know it's not not guilty, there is a dead man." Defendant made no contemporaneous objection to this comment. Defendant asserts on appeal that merely because some-

one died from defendant's shooting does not require a finding of guilty.

Defendant next recites the comment that "[t]he State has proven murder because they have shown that the defendant intended to kill Ionel Busta." Defendant again made no contemporaneous objection to this comment. Defendant asserts that this comment was error because it implied that "the only thing the State must prove to establish murder is a volitional act intending death."

We find that defendant has again failed to preserve both comments for review. Even if we were to address the merits of the issue, we find that reversal is not required. The prosecutor's comments were isolated, and the jury was later instructed with the pattern instructions relative to voluntary manslaughter, self-defense and involuntary manslaughter. Any prejudice these comments created was cured by these subsequent instructions.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BUCKLEY, P.J., and CAMPBELL, J., concur.