UNITED STATES of America,
Plaintiff-Appellee,

v.

Daniel Neal HELLER,
Defendant-Appellant.

No. 85–5304.

United States Court of Appeals,
Eleventh Circuit.

April 7, 1986.

Rosen & Rosen, P.A., Miami, Fla., John W. Nields, Jr., Howrey & Simon, Alma M. Angotti, Davis, Polk & Wardwell, M. Carr Ferguson, Jr., Barry Friedman, Washington, D.C., for defendant-appellant.

Leon Kellner, U.S. Atty., Linda Collins-Hertz, Jane W. Moscowitz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Sharon L. Wolfe, Miami, Fla., for amicus ACLU.

Bierman, Sonnett, Shohat & Sale, P.A., Donald I. Bierman, Neal R. Sonnett, Benedict P. Kuehne, Miami, Fla., for Amicus Anti-Defamation League of B'Nai B'Rith.

Before HILL and ANDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This is an appeal by Daniel Neal Heller from his conviction on charges of tax evasion and making false statements on income tax returns. Although Heller attacks the district court's action on four separate grounds, we find the first allegation of error, involving jury misconduct in the form of racial and religious slurs, so compelling that on that ground we reverse and remand the case for retrial. We, therefore, need not reach the other grounds of appeal in this opinion.

## STATEMENT OF THE FACTS

Daniel Heller, a Miami civil trial attorney, was indicted on June 30, 1982, on three counts of tax evasion in violation of 26 U.S.C. § 7201 (1983) and three counts of falsely subscribing to an income tax return in violation of 26 U.S.C. § 7206(1) (1983). A jury trial on the charges began on August 25, 1983 in the United States District Court for the Southern District of Florida. Following a 12 week trial, the jury returned a verdict of guilty on all counts on November 10, 1983. Heller received a sentence of three years imprisonment and is presently free on bond pending appeal.

The trial itself was a highly complex proceeding, involving the testimony of numerous accountants and other tax experts. Approximately one day after jury delibera-tions in the case began, the jury sent out the following note:

12:47

November 9, 1983

Your Honor,
Should these actions be addressed?

During the course of this trial, there were comments in the jury room about various testimony. Also, some ethnic slurs were made.

During the course of this trial, a juror asked a "reliable accountant" the following question (outside the jury room):

"Is it possible for an accountant to make out a person's income tax return without knowing about the person's books?"

Answer: No.

The juror stated that outside the jury room, he asked a hypothetical question of a reliable accountant along these lines: "What is the responsibility of an accountant when he signs his name to a tax return?" The accountant was reported as saying, "virtually none in the case of an individual return. In the case of a business return, his involvement would be considerable."

Please advise.

Thank you.
Virginia Davis Starker,
Fore Person

As soon as the note was received by the trial judge, Heller moved for a mistrial. The court ordered the jury to stop deliberating, and subsequently decided to voir dire the jury. The trial judge questioned each juror individually, apart from counsel for either party, in an attempt to "get rid of the taint that we have seen here." As a result of this individual voir dire, some highly disturbing facts came to light.

One of the jurors, by the name of Shatten, told the judge:

The trial had barely started or maybe it was before the trial had started, somebody, this was supposed to be a huge joke, said, "Hey, somebody asked me what kind of a case you are on." (The

juror) said, "Well, the fellow we are trying is a Jew. I say, 'Let's hang him.' "

I said to myself, I wouldn't want to be tried by anybody with this kind of mentality.

Shatten then stated that one juror had remarked during the testimony, apparently in reference to the surnames of several of the witnesses, " 'Hey, how many Kaplans are we going to have here?' ... The smirk on the man's face said to me, 'Well, Kaplan is a Jewish name and how many Kaplans are we going to have?' Gales of laughter." In addition, he told the court that "Another juror, when Rabbi Lehrman testified said, 'you know what the Rabbi came here for, he came to bless Mr. Heller,' and gales of laughter." He further stated, "There were comments like, 'Did you see the face on Heller when (the prosecutor) said such and such?' There was a kind of glee.... They (sic) were gales of laughter about this kind of conversation. They seemed to enjoy the travail that Mr. Heller was going through. And this bothered me enormously." Indeed, "there was an awful lot of prejudging the guilt or innocence of Mr. Heller.... There were three or four people in the jury room who had all the appearance of a linch (sic) mob."

Juror Shatten summed up his report of what had transpired in the jury room stating that: "As we came out of the jury box into the jury room, you would think we were in a circus. You would never know that a man's life, for all practical purposes, was on the line.... I would hate if I was pure as driven snow to be judged by people of this mentality.... I had many a sleepless night."

The court's conversations with the other jurors support Shatten's account. Juror Nolan admitted making an anti-Semitic "slur." He told the court that in the course of a conversation with a friend outside the courtroom, which was later repeated to several of his fellow jurors in the case, he was asked on what sort of case he was sitting. He told the friend that it involved a lawyer who was charged with tax evasion. According to Nolan, the friend asked, " 'Who is the lawyer?' and I said, 'I believe the name is Mr. Heller.' He says, 'Oh, the Jewish lawyer?' I said, 'yes.' He said, 'Well, how do you feel?' I said, 'the case hasn't been said, but he is Jewish. We are just going to hang him.' " When further questioned by the court on this point, Nolan claimed that his remarks were made "jokingly" and in a "teasing" manner.

Other jurors admitted that there were: "comments of how many Kaplans there were.... I guess I shouldn't get into it;" "something about a rich Jew ... in a story that was being told;" a story about a "nigger" which had offended one of the black jurors, and other racial and ethnic slurs, some of which occurred during deliberations, which the court did not permit the jurors to reveal.

In addition to the existence of numerous racial and religious slurs made by several members of the jury, the court also discovered during its voir dire that, in violation of its specific instructions, one of the jurors had during trial sought out an opinion on an issue in the case from an unidentified accountant who lived in his apartment building. The accountant apparently told Juror Shatten that in the case of an individual tax return, the accountant preparing that return has no responsibility for the veracity of the information contained within. Shatten then shared this information with the other jurors.

The trial judge concluded his questioning of each of the jurors in the case by asking them individually whether in light of what had occurred in the jury room they would still be able to reach a decision in the case based strictly on the evidence and the law without bias or prejudice. Each juror affirmed that he would be able to make such a decision. Then, following his individual conversations with each juror, the judge called all of the jurors into the courtroom at the same time and asked them to confirm their earlier promises to ignore "these extraneous outside matters that we have discussed." After all had given the necessary confirmation, the judge permitted the

jurors to continue their deliberations despite several defense motions for mistrial. Ninety minutes later, the jury returned a guilty verdict. This appeal then ensued.

## DISCUSSION

■ In a letter written in 1790 to the Hebrew Congregation of Newport, Rhode Island, in anticipation of the adoption of the Bill of Rights, President George Washington spoke emphatically of this Republic and its government giving "to bigotry no sanction, to persecution no assistance." He stated that:

> It is no more that toleration is spoken of as if it were the indulgence of one class of people that another enjoy the exercise of their inherent natural rights, for, happily, the Government of the United States ... requires only that they who live under its protection should demean themselves as good citizens in giving it on all occasions their effectual support.

A.J. Karp, *The Jewish Experience in America* (1969), Vol. I, p. 356–7. Despite longstanding and continual efforts, both by legislative enactments and by judicial decisions to purge our society of the scourge of racial and religious prejudice, both racism and anti-Semitism remain ugly malignancies sapping the strength of our body politic. The judiciary, as an institution given a constitutional mandate to ensure equality and fairness in the affairs of our country when called on to act in litigated cases, must remain ever vigilant in its responsibility. The obvious difficulty with prejudice in a judicial context is that it prevents the impartial decision-making that both the Sixth Amendment and fundamental fair play require. A racially or religiously biased individual harbors certain negative stereotypes which, despite his protestations to the contrary, may well prevent him or her from making decisions based solely on the facts and law that our jury system requires. The religious prejudice displayed by the jurors in the case presently before us is so shocking to the conscience and potentially so damaging to public confidence in the equity of our system of justice, that we must act decisively to correct any possible harmful effects on this appellant.

The government argues here that the anti-Semitic comments made within the jury room were done so purely in a spirit of jest and had no bearing on the jury's deliberations. This argument is fatally flawed in two respects. First of all, the voir dire conducted by the trial judge was superficial at best. When confronted with a number of vague statements about "prejudice" amongst the jurymen by several of the jurors, rather than probing into what was meant by these expressions, the judge simply asked each juror if he or she was affected by prejudice. We will therefore never know whether the anti-Semitic and racial "jokes" were the extent of the prejudice displayed at trial or whether additional less "humorous" comments were made. Second and more importantly, anti-Semitic "humor" is by its very nature an expression of prejudice on the part of the maker. Indeed, in a society in which anti-Semitism is condemned, those harboring such thoughts often attempt to mask them by cloaking them in a "teasing" garb. A wolf in sheep's clothing is, despite clever disguise, still a wolf. Those who made the anti-Semitic "jokes" at trial and those who reacted to them with "gales of laughter" displayed the sort of bigotry that clearly denied the defendant Heller the fair and impartial jury that the Constitution mandates.

It is inconceivable that by merely denying that they would allow their earlier prejudiced comments to influence their verdict deliberations, the jurors could have thus expunged themselves of the pernicious taint of anti-Semitism.[1] The trial judge

---

**1.** In a similar vein we have ruled in *United States v. Brantley* that "binding precedent in this Circuit holds that a juror's denials of misconduct are an insufficient basis on which to reject a claim of misconduct...." *United States v.* *Brantley,* 733 F.2d 1429, 1440 (11th Cir.1984). Indeed, Justice Brennan, concurring in the Supreme Court's decision in *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1983), stated that "...

**1528**

clearly abused his discretion when he refused to declare a mistrial upon learning of the misconduct of the jurymen.[2] We therefore reverse the conviction of defendant Heller and remand the case to the district court for retrial.

■ Although Heller raises a number of additional issues on appeal, because we reverse on the jury bias question, we need not reach those questions at this time. However, we do note that two of these issues do provide alternative grounds for reversal. There is evidence in the record to suggest that at least one of the jurors had expressed belief in the defendant's guilt long before formal deliberations began. Before the defense had opened its case, while Heller's accountant, Leonard Safra, was testifying, one of the jurors apparently remarked to the others, " 'Oh, they are both guilty.' " Indeed, Juror Shatten told the judge that there was a "presumption of guilt" among some of the jurors "at the very beginning of the trial." This premature conclusion of guilt is highly troublesome and, once again, because the trial judge did not probe the matter during voir dire, we have no clear picture of the full extent of this taint on appeal. However, from the information we do possess, it is evident that this pre-judgment may well have affected the legitimacy of the verdict and provides an alternative ground for reversal.

■ The second and more important issue raised by Heller involves extrinsic evidence coming before the jury. It is undisputed that one of the jurors questioned an unknown accountant in his apartment building about a material matter in the case. The accountant's response was repeated to the other jurymen by the offending juror. This action was highly improper and in and of itself warrants reversal. In *Remmer v. United States,* 347 U.S. 227, 74

S.Ct. 450, 98 L.Ed. 654 (1954), the Supreme Court ruled that:

In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.

*Id.* at 229, 74 S.Ct. at 451. *See also United States v. Perkins, supra.* In this case, the prejudice to the jury brought by the introduction of this extrinsic evidence cannot be fully measured. But it certainly could well have had some influence on the jurors' deliberations and its introduction thus is an independent ground for discarding their verdict.

Before concluding, we feel compelled to make an additional comment on the district court's handling of this case. The trial judge was in error when he conducted his voir dire outside the presence of counsel. This Court has ruled that: "Fed.R.Crim.P. 43 guarantees a defendant the right to be present at 'every stage of the trial.' Thus, excluding the defendants or their attorneys from the interrogation of the jurors arguably deprived them of that right." *U.S. v. Yonn,* 702 F.2d 1341, 1345 (11th Cir.1983). Counsel for the defendant should have been present during the entire juror examination process in this case.

The bigotry displayed in this case is reminiscent of another less civilized era when anti-Semitic and racist sentiments were unfortunately considered acceptable even in polite society. We conclude that we must act in the only way open to us to ensure that prejudice plays no role in the functioning of our judicial system. Although we are aware that the trial in this case lasted 12 weeks and that retrial will entail consid-

the bias of a juror will rarely be admitted by the juror himself, 'partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it.' " *Id.* at 558, 104 S.Ct. at 851.

2. *See United States v. Perkins,* 748 F.2d 1519, 1533 (11th Cir.1984). "When jurors consider extrinsic evidence, a new trial is required if the evidence poses a reasonable possibility of prejudice to the defendant."

erable time and expense, this factor cannot even be weighed in the balance when the right of an individual to a fair trial has been so severely compromised.

We are given, on this record, unusual insight into jury acts, doings and conversations. While we criticize the procedure adopted by the trial judge when he was unexpectedly confronted with a report of questionable happenings, we are indebted to him for having seen to it that the record contained the essential facts. Upon this record, our affirming the judgment of conviction based upon the jury's verdict would be an affront to our system for the administration of justice. The people cannot be expected to respect their judicial system if its judges do not, first, do so.

The judgment is REVERSED.