ERVIN, Judge,
concurring and dissenting.
Although I would affirm without discussion the trial court’s denial of appellants’ motion for change of venue and their request for a jury instruction on aggravation of an existing injury, I would reverse as to the issues relating to appellee’s use of peremptory challenges, the showing of juror bias, the trial court’s refusal to permit evidence that Kathryn Singletary would have complied with instructions had Dr. Lewis given them, and the giving of the Allen charge to the jury. Moreover, contrary to the majority’s disposition of the case, I would remand for new trial rather than for further juror interviews. Because the court’s errors spanned the breadth of the trial, I believe recitation of the facts, in addition to those recited in the majority’s opinion, is necessary.
Appellant, Ellis Singletary (hereafter Ellis), a minor child, and Ellis’ mother, Kathryn Singletary (hereafter Singletary), both black persons, appeal a jury verdict entered in favor of appellee, Dr. Mary Ken *638 dra Lewis (hereafter Lewis), who is white. Singletary was attended by Lewis, a board-certified family practitioner in Jasper, Florida, commencing on June 18, 1985, while pregnant with Ellis. Lewis testified that in 1985 she handled normal vaginal deliveries and did not treat patients who were gesta-tionally diabetic in a prior or current pregnancy, or patients with mild toxemia, preec-lampsia, or chronic high blood pressure. If any of these conditions developed during pregnancy, her policy was to refer such persons elsewhere. Moreover, she was not trained and had never performed a Caesarean section (C-section) delivery.
Lewis testified that in the medical history Singletary had given her, she recorded that Singletary had blood-pressure problems during pregnancies in 1978 and 1979, but not during her next two pregnancies in 1980 and 1981; that Singletary’s mother and aunt were diabetic; that Singletary had previously had a twin gestation; that her second child weighed ten pounds at birth; that her third baby weighed eleven pounds, two ounces; and that the latter baby had sustained temporary paralysis or loss of function of one of his arms at birth and was required to be hospitalized for three weeks.
Lewis recounted that until December 11, 1985, Singletary’s pregnancy had been essentially uneventful. She checked Single-tary’s blood pressure at every visit and said Singletary never showed any signs of elevated blood pressure. On December 11, 1985, Lewis discovered that Singletary had “spilled sugar” in her urine, which was evidence of gestational diabetes. She told Singletary that she was no longer able to care for her and scheduled an appointment for her at Shands on December 23. Single-tary’s estimated due date was either December 25, 1985, plus or minus two weeks, based upon the last date of her menstrual period, or January 6, 1986, based upon the results of her ultrasound test. Because the Shands appointment was ten or eleven days away, Dr. Lewis also scheduled an appointment for Singletary with her on December 18, but Singletary failed to keep the appointment.
Singletary testified that she arranged for a ride to the Shands appointment, but discovered the evening before that her ride was not available. On the morning of December 23, she went to Lewis’ office and asked for transportation to Shands. Lewis was unable to see her, but set an appointment for Singletary with her the following morning, and another at Shands for December 27. Singletary began spotting blood that night at midnight, commenced hard-labor pains at 3:00 that morning, and arrived at the hospital at 6:30 a.m. on December 24. Lewis testified that it was medically apparent that Singletary’s delivery was imminent, and that transportation to another hospital for a C-section was not possible or appropriate, and so she attempted to deliver the baby vaginally. After Lewis delivered Ellis’ head, she realized his shoulder was lodged under the mother’s pelvis in a condition known as shoulder dystocia, unsuccessfully applied traction (pulled on him) to free him, and then summoned Dr. Mickler, who took over and actually delivered the baby.
Dr. Mickler was told on arrival that the baby’s head had been out of its mother’s womb for about three minutes. It was his testimony that after the head is delivered, one has eight minutes before circulation is fatally cut off. He testified that he pulled on the baby between three and five minutes until he was delivered. The baby was not breathing and did not have a heart rate, and Lewis performed cardiac pulmonary resuscitation until the baby had an adequate heart rate. The baby’s right arm remained paralyzed from birth because of torn nerve roots as a result of the traction.
The plaintiffs — Ellis, his mother, and Barnett Bank’s trust company as guardian of Ellis’ property — brought a malpractice action against Lewis, Dr. Mickler, and Hamilton County Hospital, but settled with the hospital prior to trial and voluntarily dropped the suit against Dr. Mickler. Sin-gletary also dismissed her individual claim at the pretrial conference.
Plaintiffs alleged in their complaint that Lewis was negligent in her prenatal care and delivery of Ellis, which allegedly *639 caused injury to Ellis’ arm and brain damage resulting from oxygen deprivation during delivery; that Lewis failed to recognize significant high-risk factors that should have been apparent by Singletary’s second office visit in July; that she failed to timely refer Singletary to an appropriate healthcare provider who could perform a C-section if necessary; that she failed to recognize the need for a C-section and failed to timely seek necessary consultation; that she failed to adequately inform Singletary of the importance of her appointment at Shands; that she was negligent in her treatment of Singletary during delivery, which injured Ellis’ arm; and that she failed to promptly obtain assistance in order to deliver Ellis quickly enough to avoid brain damage. After an eight-day trial, the jury returned a verdict in favor of Lewis, finding that she had not been negligent in her prenatal care of Ellis’ mother nor during delivery.
Turning first to the issue relating to the defense’s exercise of peremptory challenges for a discriminatory purpose, after extensive questioning of the venire, appel-lee exercised her first two peremptory challenges against black jurors. When appellants objected and requested an explanation, appellee explained that she had struck Clady Whetstone because he worked at Occidental Chemical, which also employed plaintiff’s brother Kenneth Singletary, who was on the witness list. Appellee reportedly struck Minerva Townsend because she had not borne or raised children. Although I consider the challenge to Mr. Whetstone to have been race-neutral, I cannot reach the same conclusion concerning the reason given for striking Ms. Townsend.
Pursuant to the rule stated in State v. Slappy, 522 So.2d 18, 22 (Fla.), cert. denied, 487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988), when a party has challenged another party’s exercise of peremptory challenges on the basis of race, the other party must show that the proffered reasons were race-neutral and reasonable and that the record supports the reasons given.[1] I cannot accept the explanation that a female juror who has not given birth to children somehow renders her unable to fairly weigh the evidence regarding prenatal care and delivery of a child; otherwise, all male jurors are similarly incapable of serving.
Even more egregious was the error relating to juror misconduct described in the majority’s opinion. I disagree with the majority only insofar as it would remand the case to permit further interviews of the jurors. Once the appellants had established juror misconduct, the burden was on appellee to show that there was no reasonable possibility that the comments made in the jury room affected the verdict. Baptist Hosp. of Miami, Inc. v. Maler, 579 So.2d 97 (Fla.1991). Ms. Lumpkin provided the trial court with ample evidence of bias among the jury, and Lewis failed to satisfy her stringent burden.
On this issue, the facts of this case are similar to those in Sanchez v. International Parks Condominium Association, 563 So.2d 197 (Fla.3d DCA 1990). In that case, the plaintiff was a Cuban-American, and one of the jurors indicated after trial that another juror had made a derogatory comment about Cubans. When the trial court interviewed the jurors, several of them agreed that this particular juror had stated that Cubans “yell sue, sue, sue, or want to sue at the drop of a hat.” Id. at 198. The court reversed the final judgment and remanded for new trial, quoting from United States v. Heller, 785 F.2d 1524 (11th Cir.1986), in which a juror had made anti-Semitic remarks to other jurors during the trial. The court stated, “A racially or religiously biased individual harbors certain negative stereotypes which, despite his protestations to the contrary, may well prevent him or her from making decisions based solely on the facts and law that our *640 jury system requires.” Id. The Third District concluded that even if the other jurors were not affected by the remarks made by the biased juror, that juror was “an active participant in the deliberative process, and the verdict included his input.” Id. at 199. As a result, the plaintiff was denied an impartial jury.
In the case at bar, the majority acknowledges that appellants satisfied their burden of providing sufficient grounds to establish a basis for a jury inquiry, as required by Florida Rule Civil Procedure 1.431(h). See Snook v. Firestone Tire & Rubber Co., 485 So.2d 496, 499 (Fla. 5th DCA 1986). The problem I have with the majority’s analysis is that notwithstanding Lumpkin’s sworn testimony that juror Tuten deliberately disregarded the court’s instructions not to discuss the case and to base her verdict solely on the evidence presented at trial, the majority believes additional evidence of juror misconduct is necessary. The record clearly established juror misconduct and because appellee failed to show that the comments did not affect the verdict returned, a new trial, not more interviews, should be granted.
Moreover, even if the case is remanded for further interviews and the jurors who served were to testify that they were completely unaffected by juror Tuten’s remarks, I believe it is undeniable that by making such remarks, Tuten has demonstrated herself to be a biased and therefore an unfit person to sit on this jury. Because the verdict necessarily included Tu-ten’s bias input, it cannot stand. Sanchez.
Turning next to what I believe was an error committed during the presentation of the evidence, the court sustained the defense’s objections to testimony regarding what Singletary would have done if Lewis had at an earlier time referred her to Shands. The plaintiffs proffered Single-tary’s testimony in which she stated that in a later pregnancy, when informed that her baby was in danger, she traveled to Shands regularly and followed instructions during the pregnancy. The birth of that child was uneventful. The trial court also excluded the proffered opinion testimony of Dr. Arthur Cromartie that Singletary would probably have followed her doctor’s advice had she been told sooner of the possible complications of her pregnancy. I agree with appellants that the trial court erred in disallowing this testimony.
Although I have found no Florida cases containing a similar issue, a case from Massachusetts is instructive. In Harlow v. Chin, 405 Mass. 697, 545 N.E.2d 602 (1989), one of the key issues on appeal was whether Dr. Chin was negligent when he did not instruct the plaintiff, who had gone to see him after an injury at work, to return to him if his pain continued. When the plaintiff’s pain persisted for several weeks, he merely continued to take pain medications. He was ultimately rendered quadriplegic, and was permitted to prove at trial that if he had been advised to return for treatment, he would have had an excellent chance of avoiding the quadriplegia. The appellate court agreed that the trial judge correctly instructed the jury to decide whether Dr. Chin should have given the plaintiff such warning, and that the law presumes that a warning, if given, will be heeded. Id. at 713, 545 N.E.2d at 611.
In the case at bar, the appellants claimed that Lewis should have instructed Single-tary to seek treatment from a facility or physician capable of treating a high-risk pregnancy, and that another physician or facility could have scheduled and performed an elective C-section, thereby preventing Ellis’ injuries. Appellants’ experts, Dr. Cromartie and Dr. Bernard Nathanson, and appellee’s expert, Dr. Calvin Curry, each testified that the appropriate standard of care required Lewis to refer Singletary to a physician competent to handle high-risk pregnancies. From this evidence the jury could have concluded that Lewis should have warned Singletary to seek alternative treatment early in her pregnancy. Lewis, however, also testified that after she finally did instruct Singletary on December 11 to obtain treatment from Shands, Singletary missed her appointment on December 18 with Lewis, and failed as well to make arrangements for transportation to Shands in order to attend her appointment on December 23. Consequently, *641 appellee argues, the jury could have concluded that even if Lewis had warned Sin-gletary early in her pregnancy, she would not have heeded the warning. It seems to me that the proffered evidence — Single-tary’s testimony that she would have complied with such instruction, and her testimony that she did in fact comply with similar instructions in a subsequent pregnancy — was some evidence which could have served to rehabilitate the plaintiff in light of the damaging evidence of missed appointments, and was therefore relevant and admissible.
At trial and in her brief, appellee relied on Drackett Products Co. v. Blue, 152 So.2d 463 (Fla.1963). In that case, a boy combined water with Drano, causing the can to explode. Our supreme court approved the trial court’s exclusion of the mother’s testimony of what she would have done had she read the entire Drano label, or had she known that the product could explode if combined with water. In concluding that it was proper to exclude such speculative testimony, the court stated:
A statement by a witness as to what action he would have taken if something had occurred which did not occur — particularly in those instances where such testimony is offered for the purpose of supporting a claim for relief or damages — or what course of action a person would have pursued under certain circumstances which the witness says did not exist will ordinarily be rejected as inadmissible and as proving nothing.
Id. at 465 (emphasis added).
Even if products-liability case law is applicable to medical malpractice cases,[2] and I am not necessarily persuaded that this is so, the facts at bar do not present an “ordinary” case for exclusion, in that appel-lee was permitted to introduce evidence that Singletary missed an appointment, thus opening the door for Singletary to prove that this was not typical behavior for her. Moreover, unlike the mother’s testimony in Drackett which was clearly speculative and subjective, the excluded evidence at bar regarding Singletary’s subsequent pregnancy was factual and should have been admitted.
Although I would not find the final error regarding the Allen * charge to be reversible per se, I believe that its combination with the other errors at trial warrants reversal. The jury retired to begin deliberations at 5:15 p.m. At approximately 8:45 p.m., the jury reported it was deadlocked, and the court decided to send the jury out to dinner, after the foreman had voluntarily reported, “We are down about five to one and we don’t seem to be able to get it all together.” The jury again announced a deadlock at 10:35 p.m., at which time the *642 court gave the “Allen charge.”[3] At 11:00 p.m., the jury returned a verdict for the defendant.
I believe that the trial court erred in announcing the Allen charge so soon both after deliberations had begun, and after the court had been informed of the numerical division among the jury. Although I did not find any Florida cases directly on point, I think that the rule stated in Iverson v. Pacific American Fisheries, 73 Wash.2d 973, 442 P.2d 243 (1968), is highly persuasive. In that case, the trial judge was informed that the jurors were nine to three in favor of the defendant, and the jurors knew that the judge had been so informed. When the judge gave the deadlocked charge, the jurors, within ten minutes thereafter, returned a verdict. On appeal, the court concluded that this nominal lapse of time, combined with the jurors’ knowledge that the trial judge was aware of their numerical split, was conclusive evidence that the minority jurors had been pressured to change positions. Id. at 974, 442 P.2d at 244.
In the case at bar, I consider it quite likely that the one juror holding out may have felt that the Allen charge was directed solely at him or her, and therefore succumbed to the pressure to reach a verdict in the very short time — twenty minutes— after the charge was given. Cf. Lewis v. State, 369 So.2d 667, 669 (Fla.2d DCA 1979) (“It is impermissible for a trial court to instruct in such a manner which tends to embarass a single juror in holding to his honest convictions.”).
After eight days of trial had elapsed in the case at bar, and with the jury being confronted with complicated issues of medical malpractice, I fail to see any cause for the trial court to speed deliberations, which had, at best, only entered their fifth hour. Moreover, it is notable that the instruction was given at 10:35 p.m., at a time when the jurors surely were weary and needing rest. An Allen charge at that late hour could easily have misled the jury into believing they would be expected to deliberate until unanimity was reached, regardless of the hour. This is an unacceptable, although subtle, form of coercion that, when added to the more serious errors previously discussed, leads me to the firm conclusion that a new trial must be ordered.

. This principle has been applied in civil cases as well as criminal. Johnson v. Florida Farm Bureau Cas. Ins. Co., 542 So.2d 367 (Fla. 4th DCA 1988), review dismissed, 549 So.2d 1013 and 551 So.2d 461 (Fla.1989); City of Miami v. Cornett, 463 So.2d 399 (Fla.3d DCA), appeal dismissed, 469 So.2d 748 (Fla.1985). Accord Edmonson v. Leesville Concrete Co., — U.S. -, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991).

. Perhaps a more pertinent question, assuming the applicability of products-liability law to medical malpractice cases, is whether the Drackett rule has continuing efficacy, in that subsequent to its decision the Florida Supreme Court adopted both the doctrine of strict liability in tort, see West v. Caterpillar Tractor Co., 336 So.2d 80 (Fla.1976), and the doctrine of comparative negligence, see Hoffman v. Jones, 280 So.2d 431 (Fla.1973). As to the former, comment j to Section 402A, Restatement (Second) of Torts (1965), provides: "In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use.” The comment continues, similar to the instruction given by the trial court in Harlow v. Chin, that if such warning is given, “the seller may reasonably assume that it will be read and heeded." See also Giddens v. Denman Rubber Mfg. Co., 440 So.2d 1320 (Fla. 5th DCA 1983) (summary judgment in favor of manufacturer of tire rim reversed on the ground that the failure of the manufacturer to provide the plaintiff with an adequate warning created a jury question as to whether such failure could be considered a proximate cause of the plaintiffs injuries).
As to the applicability of Drackett after the adoption of comparative negligence, in Harless v. Boyle-Midway Division, American Home Products, 594 F.2d 1051, 1058 n. 10 (5th Cir.1979), although refusing to rule specifically on the question of whether Drackett precludes evidence regarding what a plaintiff might have done if he or she had read an adequate warning on a label, the Fifth Circuit nevertheless in dictum questioned whether Drackett should not be reconsidered in light of Hoffman v. Jones. Given the adoption of both strict liability and comparative negligence, I seriously doubt the current applicability of Drackett to products-liability cases, and question even more strongly its applicability to other classes of cases.

 Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). See also State v. Bryon, 290 So.2d 482 (Fla.1974).

. The charge is provided in Standard Jury Instruction 7.3 as follows:
Members of the jury, it is your duty to agree on [a verdict] [verdicts] if you can do so without violating conscientiously held convictions that are based on the evidence. No juror, from mere pride of opinion hastily formed or expressed, should refuse to agree. Yet, no juror, simply for the purpose of terminating the case, should acquiesce in a conclusion that is contrary to his own conscientiously held view of the evidence. You should listen to each other's views, talk over your differences of opinion in a spirit of fairness and candor and, if possible, resolve your differences and come to a common conclusion, so that [a verdict] [verdicts] may be reached and this case may be disposed of.