W. SHARP, Judge,
dissenting.
I respectfully dissent. Based on Singletary v. Lewis, 584 So.2d 634 (Fla. 1st DCA 1991), International Union of Operating Engineers, Local 675 v. Kinder, 573 So.2d 385 (Fla. 4th DCA 1991), appeal dismissed, 598 So.2d 76 (Fla.1992); Sanchez v. International Park Condominium Ass’n., Inc., 563 So.2d 197 (Fla. 3d DCA 1990), and Snook v. Firestone Tire & Rubber Co., 485 So.2d 496 (Fla. 5th DCA 1986), I agree with appellants that the trial judge should have granted their motion to conduct individual juror interviews to determine whether the juror misconduct as described by juror Dowding actually occurred in this case. If it did, the trial judge should have granted a new trial. See United States v. Heller, 785 F.2d 1524 (11th Cir.1986).
The record establishes that following the completion of a personal injury suit brought by Derrick Powell and his wife in which he received a modest monetary recovery,[1] a juror (Dowding) contacted Powell’s attorney and the trial judge concerning racial jokes and statements made by the jurors in the jury room or on breaks while the trial was in progress. Powell and his wife (who sued for loss of consortium) and Powell’s primary witnesses, Leonard Johnson and his wife (who both were passengers in Powell’s car at the time he was struck by another car) are all blacks, of Jamaican descent. The defendant’s insured (the driver of the other car involved in the accident) and the jurors are white.
The trial judge held an in-court interview of Dowding, attended by attorneys for both parties. It was transcribed and is part of the record on appeal. Dowding testified that various jurors had made a number of racial jokes and statements to each other during the trial. They laughed and participated in the jokes, although when challenged by her in the jury room, they denied they meant anything by their “jokes”, or that they were, in fact, prejudiced against Powell because of his race.
For example, Dowding testified that the juror, who was later elected to be foreman of the jury, told an old “saw” of a joke: “There’s a saying in North Carolina, hit a nigger and get ten points, hit him when he’s moving, get fifteen.” The alternate female juror supposed that because the Powells had their grandchildren living with them, their children were “probably drug dealers. And, everybody was like, yeah, yeah. And they were laughing.”
Two men on the jury laughed about Johnson’s testimony at the trial. They pointed to the book Dowding was carrying (Through a Window by Jane Goodall) which had a picture of chimpanzees on the cover, and made some sort of reference to Johnson. One said: “[a]nd Mr. Johnson got out of the car and laid down on the pavement.” They went into hysterics.
Another juror, who had worked for IBM, told the others that the turnover rate for black employees with the company was twenty-five percent but only two percent for whites. He concluded blacks “didn’t work for us as well.” Powell’s loss of wages and earning power were issues in this case. Another concluded Powell “just wants to retire.”
The trial judge denied the appellants’ motion to interview the rest of the jurors in this case. He stated his reasons on the record: The jurors’ motives and opinions why they reached their verdict cannot be the subject of inquiry; and, there was no showing the ju *791 rors considered evidence outside the record, or agreed to violate their oaths in some way. He concluded that Dowding’s testimony afforded no basis upon which to award a new trial, even assuming the testimony of the other jurors supported her version of what had transpired. I disagree.
In Baptist Hospital of Miami, Inc. v. Moler, 579 So.2d 97 (Fla.1991), the Florida Supreme Court said no jury interview procedure should be undertaken unless the sworn factual allegations urged as a basis, if found to be true, would require a trial court to order a new trial, using the standard pronounced in State v. Hamilton, 574 So.2d 124 (Fla.1991). In the Baptist Hospital case, the inquiry revealed only that some of the jurors were influenced by their sympathy for the brain-damaged child in the case, and their assumption that the hospital (defendant in the medical malpractice case) had insurance. Mere juror opinion as to why they reached the verdict rendered in a case is not a permissible field of inquiry. As the court explained, such subjective matters “inhere” in the joint decision-making process engaged in by a jury, and there is a strong public policy against allowing litigants to discover and use such matters to overturn a verdict.
But, the rule is otherwise for objective acts committed by or in the presence of the jury. In Hamilton, defense counsel argued two car magazines were present in the jury room while the jury was there, and because one or more advertisements depicted a beautiful blond model, the jury may have been “distracted.” The court said this was insufficient to have merited juror interviews, not because such matters were subjective or inhered in the verdict, but because the magazines in the jury room were irrelevant to the legal and fact issues in the case, and would have had slight, if any, potential to prejudice the outcome of the case. However, the court said overt acts, extrinsic and objective matters, which potentially might prejudice the jury, can be inquired into, and proof of whether or not the jurors actually were influenced by these happenings is not relevant.
If Dowding’s testimony is accepted as true, the jurors in this case engaged in making racial jokes, slurs, and stereotyping comments in a ease involving black plaintiffs and black witnesses and the jury’s damage and apportionment of fault determinations could well have been influenced by racial prejudice. In Singletary v. Lewis, the jury returned a defense verdict for a white doctor in a medical malpractice case where the plaintiffs were black. The appellate court ruled that the trial court erred in not ordering juror interviews when a showing was made by juror Lumpkin that the jurors made racial comments and slurs in the jury room.
In Singletary, one juror allegedly said: “They ought to sewed her up. She was a fool for having so many babies.” Another asked: “Who talked her (the plaintiff) into suing a doctor?” Some of the jurors supposedly said they preferred that the plaintiff get help from welfare rather than recover damages from the doctor. The court held that if such juror misconduct in the jury room was proven, a new trial would be appropriate.
Similarly, in Sanchez, two derogatory comments made by one juror in the jury room about Cubans in a slip and fall case involving a Cuban plaintiff was held to be sufficient misconduct to require a new trial. There, the trial judge conducted juror interviews but failed to order a new trial. It was established that one juror (who was later elected to be the foreman) said to the others: “Cubans as a whole, whenever anything like this happens, they yell sue, sue, sue or want to sue at a drop of a hat, something like that.” He later said Cubans were “ambulance chasers.”
The appellate court in Sanchez explained that the trial court mistakenly relied on the juror’s representations to the court that although the derogatory remarks had been made, they had not been influenced by them. Whether or not jurors were, in fact, prejudiced or influenced “inheres” in the verdict and is not a proper area of inquiry. The objective fact that such remarks and slurs were made by one juror was sufficient to merit a new trial in Sanchez. The court said:
Jury service is a collegial process. It may be that the other jurors were not affected by the remark, made by juror six. Juror six was, however, an active participant in the deliberative process, and the verdict *792 included his input. The jury’s verdict included not only a determination of liability, but also the amount of, damages and percentages of comparative fault. The plaintiff was entitled to have her case heard by an impartial jury. We therefore reverse the final judgment and remand for a new trial.
Sanchez at 199.
Both Sanchez and Singletary adopted for their districts the rationale set out in Heller. In that case, a Jewish defendant was convicted of tax evasion by a jury that engaged in anti-Semitic jokes and slurs. One juror told another person he was on a jury which was trying a Jewish defendant, and he said: “Let’s hang him.” Another commented on the number of the defendant’s witnesses who had Jewish surnames, and the jurors broke into “gales of laughter.” Another laughed that a Rabbi witness had come to “bless” the defendant. Others evidenced prejudice by enjoying the defendant’s discomfort in the courtroom during presentation of the prosecutor’s case.
The trial judge in Heller conducted juror interviews but concluded, as did the trial court in Sanchez, that the jurors could disregard the jokes and comments and reach a fair and impartial verdict. Not so, said the Eleventh Circuit, speaking through Judge Tuttle: “The judiciary, as an institution given a constitutional mandate to ensure equality and fairness in the affairs of our country when called on to act in litigated cases, must remain ever vigilant in its responsibility.” 785 F.2d at 1527. “Such jokes and slurs made by jurors while conducting their official duties prevents impartial decision-making from taking place. To allow such behavior in the jury room would erode public confidence in the equity of our system of justice.” The Eleventh Circuit concluded: “The people cannot be expected to respect their judicial system if its judges do not, first, do so.” 785 F.2d at 1529.
The court in Heller held that the juror’s conduct in making ethnic jokes and slurs during the trial process deprived the defendant of an impartial, fair trial.[2] Once this course of conduct was shown to have occurred, actual prejudice to the individual jurors was not relevant. It reversed and ordered a new trial.
The jurors’ racial jokes and comments testified to by Juror Dowding in this case are far more egregious than those established in Singletary, Sanchez and Heller. The participants in the racist comments were apparently multiple, not just one or two. Further, it is clear, if Dowding’s account is accurate [which the court below should determine via juror interviews], that the racial slurs and comments were directed at these plaintiffs and their witnesses. Compare U.S. v. Caporale, 806 F.2d 1487 (11th Cir.1986), cert. denied, 483 U.S. 1021, 107 S.Ct. 3265, 97 L.Ed.2d 763 (1987). In my view, Dowding’s testimony merited a full judicial interview of the other jurors to determine what actually happened in this case.[3] Accordingly, we should remand this case to conduct such interviews.[4] If it is established that the jurors in this case cracked racial jokes and made racially biased comments (as Dowding testified) while acting in their capacity as jurors in this case, a new trial should be ordered. Such behavior is objective and extrinsic. It does not “inhere” in the verdict. The fact that it happened deprived the litigants of a fair trial. Singletary; Sanchez; Heller. Amend. 7, U.S. Const. Art. I, § 22, Fla. Const.

. $10,560.00.

. .Amend. 7, U.S. Const. Art. I, § 22, Fla. Const.

. See International Union of Operating Engineers Local 675 v. Kinder, 573 So.2d 385 (Fla. 4th DCA 1991), appeal dismissed, 598 So.2d 76 (Fla.1992).

.See Snook v. Firestone Tire & Rubber Co., 485 So.2d 496 (Fla. 5th DCA 1986).