WHIPPLE, J.
 

 |aThe defendant, Jeffery Jones, was charged by bill of information with possession of a firearm or other dangerous instrumentality, namely a knife, while in the possession of cocaine, a violation of LSA-R.S. 14:95(E).
 
 [1]
 
 The defendant pled not guilty and, following a juiy trial, was found guilty as charged. The defendant filed a motion for a new trial, which was denied. He was sentenced to ten years at hard labor without benefit of probation, parole, or suspension of sentence. The defendant now appeals, designating the following seven assignments of error:
 

 1. The trial court erred by failing to take appropriate measures to adequately protect his right to trial by a fair and impartial jury.
 

 2. He was denied his right to trial by a fair and impartial jury.
 

 
 *535
 
 3. The trial court erred by failing to declare a mistrial after juror misconduct warranting a mistrial was brought to its attention by another juror during the course of the trial.
 

 4. The trial court erred by failing to conduct any inquiry into the jury misconduct which, prior to the presentation of evidence, was brought to its attention by a member of that jury.
 

 5. The trial court erred by denying his motion for a new trial.
 

 6. The trial court erred by denying his motion for postverdict judgment of acquittal.
 

 7. He was convicted by a non-unanimous verdict in violation of the United States and Louisiana Constitutions.
 

 For the following reasons, we vacate the conviction and sentence, and remand for a new trial.
 

 FACTS
 

 On May 1, 2008, Agent Mike Phelps, with the Department of Public Safety and Corrections, Division of Probation and Parole, along with other agents, went to the defendant’s sister’s house in St. Tammany Parish to make contact with the Isdefendant. He found the defendant in a back bedroom on the edge of the bed. When the defendant saw Agent Phelps, he moved his hand underneath a pillow. Agent Phelps drew his gun and ordered the defendant to show his hands. The defendant complied. Agent Phelps looked under the pillow where the defendant had his hand and found a small bag of cocaine. The defendant was arrested and brought outside, where he was patted down by Agent Brian Trosclair, with the Department of Public Safety and Corrections, Division of Probation and Parole. Agent Trosclair found a knife in the defendant’s shoe. The unsheathed, fixed blade was tucked, blade down, in the defendant’s shoe with his pants over it.
 

 ASSIGNMENTS OF ERROR
 
 1-5
 
 [2]
 

 In assignments of error one through six, the defendant argues the trial judge erred by failing to take appropriate measures to protect his right to a trial by a fair and impartial jury. He further argues he was denied his right to a fair and impartial trial.
 

 Subsequent to the jury being empan-elled, but prior to opening statements, the trial judge informed the prosecutor and defense counsel that a juror had sent him a note and that he would read the note into the record. The following relevant colloquy then took place:
 

 The Court:
 

 This note states: “Judge Green, I thought you should be informed yesterday in the jury room,” blank, who is a juror, “used the term “nigger.” He was not referring to the defendant,” — and she emphasized that, “however, this bothered me and I felt I should report ⅛.[”]
 

 “If you feel that this is insignificant, it is fine with me and will be off my conscious [sic]. You are the Judge.”
 

 The person signed and then made a footnote: “Please keep this confidential. I do not want to be singled out as causing a problem.”
 

 I have read this in this same form to both counsel in the back. Mr. Burke [defense counsel] has discussed it with his client. This disturbs the Court, but
 
 *536
 
 I will say for the record I haven’t had instances |4where there has been a certain reflection to African-Americans, but to Hispanics and to other people, because I want to ease the defendant’s mind as far as the court experience. And I think the person states that she felt that the person making the statement was not referring to the defendant in this case.
 

 But I want it to be part of the record, and I would entertain statements from the State and from the defense.
 

 Mr. Burke:
 

 Yes, Your Honor. For the record, my client is African-American. And the jury, in fact the entire jury panel yesterday that we went through were comprised of Caucasians. I don’t believe there was one African-American on the whole jury voir dire.
 

 The Court:
 

 Yes, if I may correct you, of the 48 people that were called.
 

 Mr. Burke:
 

 I’m talking about the ones we interviewed yesterday.
 

 The Court:
 

 I know, but there was an African-American among the whole, but she did not make the second panel.
 

 Mr. Burke:
 

 But on both panels that we went through there was not one African-American. The jury is comprised either totally of whites or maybe one Hispanic lady. I think Ms. Power may be Hispanic.
 

 Judge, I believe we have a right to question this juror to find out, the juror that wrote this note to question her and find out which juror said this so the Court can determine whether or not this juror should be excused, the juror that made the statement should be excused from this jury. And we would request that the Court allow us to do that.
 

 The Court:
 

 Okay. State, do you have any comment?
 

 Mr. Hoffstadt [prosecutor]:
 

 Yes. I think it’s very clear that the juror in question, if true, was not referring to the defendant, certainly not to the facts of this particular case because no facts have been put forward.
 

 It is a fact that we live in an imperfect society where people make statements based on their upbringing and their background and maybe their prejudices, that we would not use.
 

 But the fact that someone may use some kind of racial declaration regarding another race does not indicate that they have any prejudice against this particular defendant. In fact, in great detail we went through this voir dire discussion that prejudice and passion or sympathy should not be used in making the decision.
 

 And the fact that someone’s verbiage and how they refer to someone else, whether they refer to them as an African-American or | fiby religion or by any other offensive term, does not mean in any way whatsoever that they cannot give this defendant a fair trial.
 

 If we go and start looking into what people have said through their entire life about another group of individuals, we’d never have jurors. Because I think that probably each and every one of us at one time or another have said something that we look back and are ashamed of.
 

 I think it’s important, Your Honor, very important in this case, that there has been no evidence presented, and even more important, that this juror who reported it was quite clear that the
 
 *537
 
 person, if it was said, was not referring to this defendant.
 

 And there is no reason to question this person about a phrase he may or may not or she may or may not have used because it doesn’t have anything to do with this case. It’s just the way some people talk. We pity them because of the way some people talk. It would not be appropriate to question this juror.
 

 The Court:
 

 Anything else, Mr. Burke?
 

 Mr. Burke:
 

 I haven’t seen the note the- — the Court hasn’t permitted me to see the note, so I don’t know exactly what it says. But I think the Court would have a duty to talk to this juror to inquire who this individual is so the Court could find out whether or not whoever said this is making it directed at my client, to find out whether or not this juror has animosity against African-Americans. And we’d ask the Court to do this.
 

 The Court:
 

 Okay, gentlemen, I’ve been going over this at least a half hour in my mind, so the Court has these comments: As I told you in chambers before I came out and read this, I think in my fifteen years I’ve only had this come up one time. And this is, to me, different than when you are doing a venire and ... you are questioning jurors individually with reference to statements they’ve made in the box and the attorneys want to bring them into the chambers and ask them in order for you to be able to rule to accept them as a juror or not accept them as a juror.
 

 And also, I think it’s different than in a capital case where you even have to go more in depth as to jury qualifications.
 

 The Court’s position on this is it cannot, this lady asked me not to divulge her name nor the name of the person who made the statement. To do so, I would lose her confidence and possibly the confidence of all of the jurors, because she made a confidential statement to me.
 

 Also, in doing so, the person who made the statement would know that someone on the jury box has said something, so I think it would disrupt the complete function of the jury, what they are here for. And in that light, the Court when I bring them in prior to your opening statements, I’m going to do my little thing about not talking to people, if we see them in the hall, etc.
 

 IfiAnd I’m going to go one step further, though, and use the portion that I use in my jury instructions at the end that jurors are not to be influenced by sympathy, passion, prejudice or public opinion. And I am going to caution them that they are to listen to the evidence, make their decision upon the evidence presented and reach a just verdict. So that is how the Court is going to approach it.
 

 Mr. Burke:
 

 We would object to the Court’s ruling, respectfully object to the Court’s ruling, Judge. And we’d ask that the note of the juror be placed in the record and that if the Court deems it needs to be sealed, that it be sealed.
 

 A criminal defendant has a Sixth Amendment right to a “fair trial by a panel of impartial, ‘indifferent’ jurors.”
 
 Irvin v. Dowd,
 
 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Louisiana Code of Criminal Procedure article 797 protects a defendant’s right to an impartial jury.
 
 See also
 
 La. Const, art. 1, § 16.
 

 The instant matter presents us with a disturbing, but somewhat unique set of facts and, as such, Louisiana jurisprudence
 
 *538
 
 provides little guidance for resolution of this case. Similarly, the defendant notes in his brief that he found no state cases on point. Accordingly, he cites federal and non-Louisiana case law. The state cites no Louisiana cases regarding these first six assignments of error, and only discusses the two cases mainly relied on by the defendant, namely
 
 United States v. Heller,
 
 785 F.2d 1524 (11th Cir.1986) and
 
 Wright v. CTL Distribution, Inc.,
 
 650 So.2d 641 (Fla.App.2d Dist.1995).
 

 In
 
 Heller,
 
 approximately one day after jury deliberations had begun, a jury note was sent to the trial judge asking if the issue,
 
 inter alia,
 
 that some ethnic slurs were made should be addressed. The judge ordered the jury to stop deliberating and, upon questioning the jurors, learned that ethnic and racial slurs, including use of the term at issue herein, had been bandied about dui’ing deliberations, with many of the slurs directed toward the defendant. The judge concluded his questioning of the jurors by asking them individually whether, in light of what had occurred in the _yury room, they would still be able to reach a decision based strictly on the evidence and the law without bias or prejudice. Each juror affinned he would be able to make such a decision. The judge then permitted the jurors to continue their deliberations despite several defense motions for mistrial.
 
 Heller,
 
 785 F.2d at 1525-27.
 

 On review, the Eleventh Circuit held the district court should have granted a mistrial after learning of the racial and ethnic slurs by certain jurors during deliberations. The court further found the trial judge’s individual questioning of the jurors, which was superficial at best in that it consisted mainly of asking them if they were affected by prejudice, was insufficient.
 
 Heller,
 
 785 F.2d at 1527-28. The court noted that “racism and anti-Semi-tism remain ugly malignancies” and that a “racially or religiously biased individual harbors certain negative stereotypes which, despite his protestations to the contrary, may well prevent him or her from making decisions based solely on the facts and law that our jury system requires.”
 
 Heller,
 
 785 F.2d at 1527.
 

 In
 
 Wright,
 
 the African-American plaintiff, who was involved in a motor vehicle accident, brought a negligence suit against the driver and owner of the truck that hit her. An all-white jury returned a verdict finding Wright 70 percent negligent. The day after the verdict was entered, juror Laura Reardon contacted the appellants’ counsel through Reardon’s attorney and described jury misconduct occurring during deliberations. Reardon executed a sworn affidavit in which she stated that racial slurs and comments occurred during deliberations. She stated she heard several members of the jury say they did not want to award anything to Wright because she was a fat black woman on welfare who would simply blow the money on liquor, cigarettes, jai alai, bingo or the dog track.
 
 Wright,
 
 650 So.2d at 642.
 

 | sIn reversing the trial court’s denial of Wright’s motion for new trial or motion to conduct a post-trial interview based on jury misconduct, the court of appeal found:
 

 [T]he alleged racial slurs and derogatory racial comments the jurors made during deliberations in this case may have denied the appellants a fair and impartial trial. Moreover, the trial court did not even afford the appellants an opportunity to inquire of the jury regarding the alleged prejudice.- The trial court simply dismissed the accusations of bigotry in Reardon’s affidavit and denied the appellants’ motion for new trial. At the very least, appellants must have an opportunity to determine
 
 *539
 
 the truth or falsity of the allegations made by Reardon.
 

 If Reardon’s allegations are true, a jury interview will not suffice due to the extreme racial comments made by the jurors. Any attempt by the jurors to characterize their racially charged comments would have no effect of erasing prejudice and bigotry so evident. It is an abuse of discretion for the trial court to refuse to declare a mistrial upon learning of juror misconduct. (Citations omitted).
 
 Wright,
 
 650 So.2d at 643.
 

 While
 
 Heller
 
 and
 
 Wright
 
 are distinguishable from the instant matter in that the religious or racial epithets in those cases were ostensibly more pervasive and, more importantly, directed toward the criminal defendant and civil plaintiff, we find their treatment of the issue of biased jurors therein to be instructive. The letter given to the trial judge in this case indicated the offending juror did not direct his racial slur toward the defendant. The State in its brief points out, as well, that the isolated instance was not directed toward the defendant. We find this distinction, however, to be of no moment. As noted by the court in
 
 United States v. Henley,
 
 238 F.3d 1111, 1121 (9th Cir.2001), when dispelling a similar argument put forth by the government, “We have considerable difficulty accepting the government’s assumption that, at this time in our history, people who use the word ‘nigger’ are not racially biased.”
 

 In
 
 People v. Jones,
 
 105 Ill.2d 342, 351-52, 86 Ill.Dec. 453, 475 N.E.2d 832, 836-37 (Ill.1985), where the defendant was African-American, a juror who brought racist material into the jury room was replaced by an alternate juror who had not seen the | ^material. Similarly, the trial judge in the instant case should have removed the offending juror and replaced him with the alternate juror. That option notwithstanding, the trial judge, at the very least, should have investigated the matter.
 
 See Henley,
 
 238 F.3d at 1121-22 (where the court found a hearing should have been held by the lower court to determine a juror’s alleged statements and racial bias). On the record before us, we conclude that simply hearing argument from both counsel, while neglecting to question a single juror, was not a sufficient remedy for ensuring a fair and impartial jury. We further conclude that the defendant’s right to a fair and impartial jury outweighed the concerns, as noted by the trial judge, of disrupting the “function of the jury” or losing the confidence of the juror who brought the note.
 

 At sentencing, the defendant’s motion for a new trial, addressing the same racial epithet issue, was argued before a different judge. The sentencing judge, who was not the same person as the trial judge, stated that he had read the note given to the trial judge. He acknowledged he found the racial term offensive to the defendant and to the court. However, in denying the motion for a new trial, he did not find from his “review of the record and consideration of this matter that an injustice was done to this defendant relative to the jury’s finding of guilty.” In accordance with the foregoing discussion, we find the sentencing judge likewise erred in denying the defendant’s motion for new trial. As the record demonstrates, the trial judge was apprised of the issue of the offending juror even before the first witness was called at trial. The issue is whether such language reflected undisclosed bias by a tainted juror or jurors could and should have been addressed and remedied at that point. Instead, nothing was done. Thus, an important issue remains, but cannot be resolved,
 
 %.e.,
 
 the extent to which the jury, as a whole, may have been tainted.
 

 
 *540
 
 | ipThe State concedes to the “heinousness of the term at issue.” We agree. We find that the use of such a pernicious racial slur by a juror, whether specifically directed at the African-American defendant or not, and with limited initiative on the part of the trial judge to rectify the situation, warrants a new trial. There are circumstances, such as these, which show such a probability that prejudice will result that the trial is deemed inherently lacking in due process.
 
 See Estes v. Texas,
 
 381 U.S. 532, 542-43, 85 S.Ct. 1628, 1632-33, 14 L.Ed.2d 543 (1965);
 
 Jones,
 
 105 Ill.2d at 352, 86 Ill.Dec. 453, 475 N.E.2d at 837.
 

 We acknowledge the difficult issues faced by the judges below, as well as their well-intentioned efforts to address the situation presented at trial. However, on the record before us, we find that the trial judge erred in failing to properly investigate the matter by, at the very least, conducting his own voir dire of the jurors. The sentencing judge likewise erred in failing to grant the defendant’s motion for a new trial. Accordingly, these assignments of error have merit. The defendant’s conviction and sentence are thus vacated. The matter is remanded for a new trial.
 

 ASSIGNMENT OF ERROR NO. 7
 

 In his seventh assignment of error, the defendant argues he was convicted by an 11-1 non-unanimous verdict in violation of the United States and Louisiana Constitutions. Specifically, the defendant contends that LSA-C.Cr.P. art. 782(A) violates the Sixth Amendment right to a jury trial since it must be considered in light of the Fourteenth Amendment right to due process of law. Having found reversible error, we normally would pretermit consideration of all remaining assignments of error. However, because there is a high probability that the issue raised in this assignment of error will arise again on remand, we will consider this issue now.
 
 See State v. Griffin,
 
 2007-0974, p. 21 (La.App. 1st Cir.2/8/08), 984 So.2d 97, 114.
 

 The punishment for a conviction under LSA-R.S. 14:95(E) is confinement at hard labor. Louisiana Constitution article I, § 17(A) and Louisiana Code of Criminal Procedure article 782(A) provide that in cases where punishment is necessarily at hard labor, the case shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. Under both state and federal jurisprudence, a criminal conviction by a less than unanimous jury does not violate a defendant’s right to trial by jury specified by the Sixth Amendment and made applicable to the states by the Fourteenth Amendment.
 
 See Apodaca v. Oregon,
 
 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972);
 
 State v. Belgard,
 
 410 So.2d 720, 726 (La.1982);
 
 State v. Shanks,
 
 97-1885, pp. 15-16 (La.App. 1st Cir.6/29/98), 715 So.2d 157, 164-65.
 

 The defendant suggests that
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002);
 
 Apprendi v. New Jersey,
 
 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); and
 
 Jones v. United States,
 
 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), which emphasize the necessity of a unanimous verdict, “implicitly overrule the prior anomalous holding in
 
 Apodaca,
 
 and must be taken account of by this Court.” This argument has been repeatedly rejected by this court and our supreme court. Our supreme court has very x-ecently affirmed the constitutionality of Article 782.
 
 See State v. Bertrand,
 
 2008-2215 (La.3/17/09), 6 So.3d 738. The
 
 Bertrand
 
 Court specifically found that a non-unanimous 12-person jury verdict is constitutional and that Article 782 does not violate the Fifth, Sixth, and Fourteenth Amendments.
 
 Bertrand,
 
 2008-2215 at p. 8, 6 So.3d at 743.
 

 
 *541
 
 This assignment of error is without merit.
 

 |12DECREE
 

 For the above and foregoing reasons, we vacate the defendant’s conviction and sentence. The matter is hereby remanded for a new trial.
 

 CONVICTION AND SENTENCE VACATED; REMANDED FOR A NEW TRIAL.
 

 HUGHES, J., dissents.
 

 [1]
 

 . The defendant was also charged with possession of cocaine, a violation of LSA-R.S. 40:967(C). The State nol-prossed this charge.
 

 [2]
 

 . Although the defendant's brief refers to six assignments in the heading or caption, the issue of sufficiency of the evidence, raised in the sixth assignment of error, was not actually argued in this appeal or briefed. As such, this assignment of error is considered abandoned.
 
 See
 
 Uniform Rules — Courts of Appeal, Rule 2-12.4.